IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **3:09-CR-216-L** |
| | § | |
| **RENE SALAZAR** | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court is Defendant Rene Salazar's Motion to Suppress Evidence, filed November 13, 2009 (the "Motion"). After carefully considering the Motion, record, and applicable law, the court **denies** the Motion.

**I.       Background**

On the evening of June 24, 2009, federal agents from the National Gang Unit worked with officers from the Dallas Police Department's Gang Unit in a yearly initiative to target citizen gang members who had outstanding warrants of arrest. At approximately 9:45 p.m., the agents and officers were investigating the citizenship status of an arrested gang member in a residential neighborhood. During the course of the investigation, a gold vehicle drove by them and, from the vehicle's driver's side window, multiple gunshots were fired in their direction. The agents and officers did not have a clean opportunity to return fire before the gold vehicle sped off. After seeing the gold vehicle turn onto another street, the officers entered their own vehicles to pursue their assailant.

The gold vehicle was located soon thereafter, parked in front of a house. Dallas police observed Defendant Rene Salazar ("Defendant") exit the driver's side of the vehicle and run into the residence. There was also a passenger in the vehicle who was quickly extracted and arrested by

police.  After waiting a short time for a support unit to arrive, the officers entered the residence in

hot pursuit of Defendant.  Immediately, the officers began to clear the house of occupants and

ultimately located Defendant in the bathroom taking a shower; he was taken down and arrested.

After the house had been cleared and Defendant was in custody, officers were instructed to

search the surrounding neighborhood streets for the firearm.  Consent was obtained at 10:05 p.m.

from Defendant's father, the owner of the house, to conduct a warrantless search of the residence.

The firearm was ultimately recovered from a freezer in the kitchen, and the officers searching the

surrounding streets were instructed to stop their search.  Defendant was indicted on August 4, 2009,

on two counts of assault of a federal officer in violation of 18 USC § 111 and on one count for

possession of a firearm during and in relation to a crime of violence in violation of 18 USC §

924(c)(1)(A).

Defendant now moves to suppress the firearm, arguing that the gun was obtained illegally

before consent to search the house for it was obtained.  The government contends that the firearm

was recovered only after such consent was given.  Defendant's jury trial is set for January 11, 2010.

## II.    Legal Standard

Warrantless searches and seizures inside a person's home are presumptively unreasonable

under the Fourth Amendment to the United States Constitution; however, this presumption of

unreasonableness may be rebutted when the occupant or owner gives valid consent to conduct the

search or exigent circumstances justify the search.  *Steagald v. United States*, 451 U.S. 204, 211-12

(1981); *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993).  In ruling on a consensual

search exception, the court may be required to address four separate issues.  First, the government

must establish that consent was obtained to conduct the search.  *United States v. Freeman*, 482 F.3d

829, 831 (5th Cir. 2007).  Once the government has established that consent to search existed, the next question is whether the consent was voluntary.  *Id.* at 832.  Voluntariness is determined from the totality of the circumstances surrounding the search; relevant factors include: "(1) the voluntariness of defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence would be found."  *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997) (footnote omitted).  All six factors are relevant; however, no single factor is dispositive or controlling on the issue of voluntariness.  *Id.*  If the government establishes voluntary consent, the two issues that remain are "whether the search was within the scope of the consent; and whether the consenting individual had authority to consent."  *Freeman*, 482 F.3d at 832.

## III.    Analysis

The court held an evidentiary hearing on December 9, 2009, and has since carefully reviewed the evidence, the testimony, and transcript of the evidentiary hearing.  The court's resolution of the consent matter turns on the credibility of the witnesses.  In assessing the credibility and believability of each witness, the court considered all of the circumstances under which the witness testified, including: the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence;

and whether such contradiction related to an important factor in the case or some minor or unimportant detail.

The court determines that the consent matter involves two ultimate issues: first, whether the consent obtained comports with the legal standard set out above and thus allowed a legal consent search of the house.  Second, if the consent was validly obtained, the next issue the court must determine is when the actual search occurred—either before or after consent was given.  The court will begin its analysis by contemplating the first issue.

For consent to have been validly obtained, the government must establish all four of the factors set forth in the legal standard above.  First, it is undisputed by the parties that a consent form was signed by the owner of the house, Defendant's father; this form gave police officers permission to conduct a *complete* search of his residence located at 301 South Henderson Avenue, Dallas, Texas, 75214.  The court concludes that, from the perspective of a reasonable police officer, this would mean that Defendant's father gave the police officer consent to search any place in the residence where a handgun could be concealed.  Accordingly, the court finds that consent was obtained and that the firearm ultimately recovered was within the scope of the search.  The court also determines that Defendant's father had authority to give consent because the house was his property; he was the owner.  The court therefore need only determine whether consent was given voluntarily.

The six factors listed in the standard above for determining the voluntariness of consent presume that the person who gives consent is also the defendant.  In this case, the person who gave consent Defendant's father, who is not a defendant.  Accordingly, not all of the factors for determining voluntariness will be applicable, but the factors still provide meaningful guidance

insofar as determining whether his consent was given voluntarily. It is undisputed that Defendant's father was not in police custody at the time he gave consent. Witnesses on both sides testified that he was not in handcuffs and was not coerced into speaking with police officers. It is also undisputed that Defendant's father possessed a reasonable level of education and intelligence so as to understand that he did not have to sign the consent form when he spoke with police officers—he was a competent individual who was aware of his right to refuse consent. He even agreed on cross examination that his consent was given freely and voluntarily. Furthermore, the court went to some length at the hearing to determine that he was capable of reading Spanish and that he understood the consent form when he signed it. The court therefore concludes that consent was given voluntarily and was validly obtained by the police officers.

Accordingly, the sole subject at issue between the parties is whether consent to search the house was obtained before or after the firearm was located. The witnesses provided by the government testified that no search of the house occurred until after consent was obtained. The witnesses for the defense, Defendant's mother and father, testified that the search occurred *before* consent was obtained, and specifically described a police officer carrying a bag containing a case of bullets or a firearm outside of the house prior to consent being given.

As earlier stated, the resolution of the conflict in testimony turns on credibility. The evidence reveals that the time frame in question—from shots fired to obtaining consent to search—consisted of approximately twenty minutes, starting at 9:45 p.m. until 10:05 p.m. This means that, for Defendant to have a valid contention that the search was illegal, the search must have occurred within that twenty-minute time frame before consent was given. The evidence does not break down the time line of the ensuing events following the gunshots into exact minutes. The

testimony revealed that all happenings following the gunshots transpired in quick succession as more officers arrived on the scene in response to the radio call of shots fired. Notwithstanding the hurried urgency of the ensuing events, the court determines that twenty minutes is an extremely small space of time for an illegal search to have occurred in addition to all of those events. In other words, the court finds that the passage of time is commensurate with the police account of what took place that night.

Shots were initially fired at approximately 9:45 p.m. The police officers and federal agents were not already in their vehicles at this time. Once they observed the gold car drive away and turn off onto another street, police officers then rushed to enter their own vehicles and began pursuit. The officers lost sight of the gold car and had to visually scan the neighborhood streets for the car. After an indeterminate amount of time—probably a few minutes—the officers were able to locate the vehicle parked in front of a house and observed Defendant running into the residence from the driver's side of the car. Officers then exited their own vehicles and approached the gold car, arresting the passenger who remained inside. Instead of immediately entering the house in pursuit of Defendant at that point, the officers waited for an indeterminate amount of time—probably another minute or two—for a support unit to arrive. Once the support unit arrived, the officers, upon entering the house, encountered multiple occupants. Over the course of the next several minutes, officers brought every occupant outside of the house, including Defendant who had been pulled from the shower and arrested. It was probably close to 10:00 p.m. when everyone had been removed from the house and the area was deemed secure. At that point, every testifying officer stated that he or she was instructed to remain outside of the house while consent was obtained to conduct a search of the house and, to their knowledge, no officer or agent remained inside the house during this time

period.  Some of the officers were further instructed to begin searching along the neighborhood streets for a firearm, and testimony revealed that those officers searched the surrounding streets for up to thirty minutes after the protective sweep was completed, only stopping once they learned via radio that the firearm had been located in the house.

From the time the protective sweep was completed until consent was obtained at 10:05 p.m., there probably was less than a five-minute window for an illegal search to have occurred.  Such a short time span tends to contradict the testimony of Defendant's mother and father, insofar as the police's version of events is more believable.  Defendant's father testified that about twenty or thirty minutes passed after he was removed from the house, but before he gave consent to search.  He further testified that during this time period he saw a police officer exiting the house holding a bag that ostensibly contained an ammunition case.  Defendant's mother testified to the same account when she took the witness stand.  Both defense witnesses, however, also gave statements to police on the night of the incident in question that did not, in several key respects, mirror the testimony provided at the evidentiary hearing.  Specifically, the statements they gave to police did not include certain facts that they testified to at the hearing or their testimony at the hearing was inconsistent with portions of their statements to police.

For example, the statements Defendant's mother and father made to police immediately following the events of that night mentioned nothing about a bag taken from the house by police before consent was given.  Some smaller, seemingly insignificant details of the statement given by Defendant's mother also changed at the hearing.  At the hearing she testified that when Defendant entered the house, he said to her on his way to the bathroom, "I am home."  In her previous statement to police that night, she said that Defendant "said nothing" when he entered the house.

**Memorandum Opinion and Order – Page 7**

The court finds that this seemingly insignificant switch goes directly to the issue of credibility. From her original statement, the court draws the reasonable inference that Defendant said nothing because he knew he had been involved in an incident with police and did not want to interact with his mother.  The mother, based on this silence, knew that something was amiss.  She immediately looked out the window to see her son's gold car being overtaken by police and his friend being arrested.  The reasonable explanation for her conduct is that she was expecting someone to be with her son, and she looked out the window because nobody was with him when he entered the house. Defendant's alleged statement, "I am home," would tend to downplay his run-in with police that had just occurred, instilling a calm that Defendant's mother knew did not exist; otherwise, she would have had no reason to look out the window and view the scene herself.

       The court also has a difficult time reconciling why police officers would have been ordered to search for the firearm along the neighborhood streets once the house was secure of occupants if the firearm had already been illegally obtained.  If the firearm had truly been obtained illegally, the court cannot understand why the police would then resort to covering their tracks via a consent form after the fact.  It would have been just as easy—and far simpler—for the police to have contended that the firearm was located in plain view.  For these reasons and the reasons stated above, the court finds the testimony given by the police officers to be more credible than the testimony given by Defendant's mother and father.  Furthermore, that Defendant has more at stake in this case (potential conviction and prison time) than the police officers do militates in favor of an embellished account from his side.  With significantly less at stake, the police officers have little reason to fabricate their version of the facts.

The court determines that the testimony of Defendant's mother and father is speculative and convenient.  It is speculative because there is no exact breakdown of that evening's time line into specific minutes, and arguing that the search transpired before consent was given is less credible because such testimony does not comport with a logical sequence of events where consent to search was obtained *before* conducting the search.  It is convenient for the same reason—there is no specific breakdown of that evening's time line into specific minutes, so the best the court can glean from the evidence is an approximation of time.  In light of the court's analysis above, the court finds the police testimony more believable and consistent with the passage of time produced by the evidence.  This is not to say that the testimony of Defendant's mother and father was intended to be deceitful or misleading.  There are several factors that could affect their recollection of events that night, including the passage time.  Another factor is their vested interest in the outcome of the case—not wanting to see their son in trouble with the law—and a resulting personal bias that could subconsciously cause them to honestly "remember" or state events that did not occur, such as Defendant's announcement "I am home," or that did not occur in the sequence stated by Defendant's mother and father.

In sum, this is a credibility determination, and the court concludes that the greater weight of the evidence supports the police's version of events on the evening of June 24, 2009.  The court therefore finds that the firearm was obtained during a legal consent search that took place after consent was validly obtained and voluntarily given by Defendant's father, the owner of the residence.  Because the search was valid, and the firearm located was within the contemplation of the search, the court declines to suppress the firearm as evidence at trial.

**IV.    Conclusion**

**Memorandum Opinion and Order – Page 9**

For the foregoing reasons, the court **denies** Defendant Rene Salazar's Motion to Suppress Evidence.   Accordingly, the firearm recovered from the freezer inside the house will not be excluded.  The government is at liberty to present the firearm as evidence against Defendant at his trial.

**It is so ordered** this 31st day of December, 2009.


Sam A. Lindsay
United States District Judge